714 So.2d 518 (1998)
Gregorio ARMENTEROS, and Maria Armenteros, his wife, Appellants,
v.
BAPTIST HOSPITAL OF MIAMI, INC., A Florida corporation, Appellee.
No. 97-1207.
District Court of Appeal of Florida, Third District.
June 10, 1998.
Rehearing Denied July 29, 1998.
*519 Casuso & Lopez and David A. Wagner and Raul R. Lopez, Gainesville, for appellants.
Wicker, Smith, Tutan, O'Hara, McCoy, Graham & Ford and Shelley H. Leinicke, Fort Lauderdale, for appellee.
Before NESBITT, GODERICH and SHEVIN, JJ.
NESBITT, Judge.
Gregorio Armenteros was employed by a subcontractor hired by the general contractor building a structure on Baptist Hospital's grounds. Armenteros claimed that he was injured in a fall from defectively erected scaffolding, and sued the hospital asserting that Baptist had breached its duty of care by allowing an unsafe work condition to remain uncorrected on its premises. Baptist answered and moved for summary judgment on its affirmative defense that it owed no duty to a subcontractor's employee. Armenteros opposed summary judgment asserting that Baptist had retained the right to, and did, exercise control over the day-to-day construction operations, hence, Baptist was liable as an owner/contractor. The court granted summary final judgment in Baptist's favor. We affirm.
*520 Armenteros' accident occurred on a construction site at Baptist where a multi-story addition was being added above an existing surgery center building. The project was known as the Miami Vascular Institute Clinical Services Expansion Project at Baptist. Throughout the course of the project, Baptist continued to operate its hospital and to provide medical and surgical care to its patients. Surgeries were performed twenty-four hours a day, seven days a week. To ensure the safety of these patients, the construction schedule had to be sensitive to ongoing hospital activities and the goal of maintaining quality patient care.
To this end, the construction contract stated that construction workers were limited to certain entrances and exits so that the hospital could avoid widespread contamination by construction debris and dirt. Similarly, the contract provided that construction workers could not use the hospital cafeteria area. Baptist retained the right to stop work temporarily if the construction was interfering with surgical procedures. The evidence showed that jack hammering and other construction activities could cause excessive vibrations in the surgical site located on a floor directly beneath the construction site. One eye surgeon had delicate surgical equipment mounted on the ceiling of the operating room which would vibrate dangerously and unacceptably if certain types of construction work were taking place. To accommodate surgical schedules, construction might be stopped for thirty minutes during an eye surgery.
In addition to the construction of the Miami Vascular Institute Clinical Services Expansion Project, Baptist was simultaneously undergoing construction on other parts of the hospital. Centex-Rodgers Construction Company was hired to perform a variety of functions, including control of the construction management on the multiple projects. The hospital needed assistance in managing all facets of those projects because some subcontractors worked on all projects and others only worked on a few of the projects. Without Centex-Rodgers, there would have been three or four general contractors all working on different construction jobs. However, a construction contract was signed on November 13, 1991, between Baptist Hospital and Centex-Rodgers which specifically identified Baptist as the owner and Centex-Rodgers as the general contractor.[1]
This contract expressly directed that all portions of the contract were to be performed by subcontractors or other appropriate agreement with the general contractor. It was undisputed that Centex-Rodgers pulled the permit and was responsible for all administrative work and for ensuring all items were coordinated with the contract documents. Centex-Rodgers prepared all purchase orders, conducted weekly safety meetings with the subcontractors, and otherwise performed all general day-to-day supervision of the job. Centex-Rodgers developed the bid packages to solicit bids from subcontractors. One of the Centex-Rodgers employees had overall responsibility to oversee all day-to-day construction activities, including overseeing all subcontractors and ensuring that they were doing their work properly and conforming with the contract documents and specifications.
Armenteros was injured while in the course of his employment for General Forming Corporation, a subcontractor who was responsible for certain concrete work on the project. General Forming, like all of the successful bidders/subcontractors, had its contract with Centex-Rodgers and not with Baptist.
As a general rule, one who hires an independent contractor is not liable for injuries sustained by that contractor's employees *521 in their work. See Van Ness v. Independent Constr. Co., 392 So.2d 1017 (Fla. 5th DCA 1981); Lake Parker Mall, Inc. v. Carson, 327 So.2d 121, 123 (Fla. 2d DCA 1976). As the Supreme Court observed in Conklin v. Cohen, 287 So.2d 56, 60 (Fla.1973):
the owner may be held liable if he has been actively participating in the construction to the extent that he directly influences the manner in which the work is performed. Conversely, if the owner is a passive nonparticipant, exercising no direct control over the project, he cannot be held liable. To impose liability upon an owner who is not an employer as defined by the statute, one or more specific identifiable acts of negligence, I. e., acts either negligently creating or negligently approving the dangerous condition resulting in the injury or death to the employee, must be established.
Thus, Florida case law has followed the analysis outlined in Restatement(Second)of Torts section 414, which provides:
One who entrusts work to an independent contractor, but who retains the control of any part of the work, is subject to liability for physical harm to others for whose safety the employer owes a duty to exercise reasonable care, which is caused by his failure to exercise his control with reasonable care.
See Martin v. Venice Hosp., 603 So.2d 1377, (Fla. 2d DCA 1992); Clerkin v. Kendall Town & Country Assoc., 535 So.2d 288 (Fla. 3d DCA 1988).
Also, there was no evidence that although the hospital had hired a true general contractor for the construction project, the hospital actively supervised and directed the construction work on the project. See, e.g., Wills, 351 So.2d at 29; Conklin, 287 So.2d at 60; E.J. Strickland Constr., Inc. v. Department of Agric. & Consumer Serv. of Fla., 515 So.2d 1331 (Fla. 5th DCA 1987); Life From The Sea, Inc. v. Levy, 502 So.2d 473, 474 (Fla. 3d DCA 1987).
Appellants' contention is that sufficient testimony was given to make it a jury question whether Baptist had exercised enough control to be considered to have actively supervised and directed the project. However the undisputed facts demonstrate that the hospital did no more than purchase materials to utilize its tax free status, inspect the work to ensure the high standards it sought to maintain, and control schedules so as to permit surgeries to go uninterrupted and patients to go unendangered. See Cruz v. Gables Colony Ltd., 579 So.2d 278 (Fla. 3 DCA 1991) (affirming summary judgment, this court concluded that property owner did not play active role in rendering services provided by independent contractor and owner did not commit specific act of negligence to cause harm to contractor's employee, thus owner had no safety duty to contractor's employee, who was injured and died when he was struck by crane, even though owner leased crane; lease of crane by owner, rather than by general contractor, was performed for credit purposes as accommodation to contractor, crane chosen for job was selected by general contractor, and owner played no active part in supervising construction effort); Clerkin v. Kendall Town & Country Associates, Ltd., 535 So.2d 288 (Fla. 3d DCA 1989) (affirming summary judgment, this court held that the property owner owed no duty to exercise reasonable care for the safety of a subcontractor's employee where the property owner hired a general contractor and did not serve as its own general contractor on the construction project, where the property owner's participation in the project was merely in the nature of insisting that established time schedules be honored). Such limited acts, even when grouped together, will not constitute the control element necessary for a finding of liability.
As stated in Juno Industries, Inc. v. Heery International, 646 So.2d 818, 823 (Fla. 5th DCA 1994)(summary judgment affirmed as to owner, Disney):
Just because an owner has the right to inspect work for conformance with the contract does not change the owner from a passive nonparticipant to an active participant in the construction with the right to supervise or control the work, nor does it destroy the independent status of the contractor and render the owner liable for the contractor's negligence in performing the work by creating a dangerous condition.

*522 Coudry v. City of Titusville, 438 So.2d 197 (Fla. 5th DCA 1983).
Comment c to Restatement(Second)of Torts section 414 supports this analysis and provides:
c. In order for the rule stated in this Section to apply, the employer must have retained at least some degree of control over the manner in which the work is done. It is not enough that he has merely a general right to order the work stopped or resumed, to inspect its progress or to receive reports, to make suggestions or recommendations which need not necessarily be followed, or to prescribe alterations and deviations. Such a general right is usually reserved to employers, but it does not mean that the contractor is controlled as to his methods of work, or as to operative detail. There must be such a retention of a right of supervision that the contractor is not entirely free to do the work in his own way. (Emphasis added.)
The cases relied on by appellant address scenarios where the owner exercised control over day-to-day work performance. While Baptist admitted interfering with scheduling, there was no evidence that the hospital interfered with the project's actual physical construction. There is no evidence that it was supervising the project. Nor was evidence submitted to refute Baptist's contention that it completely delegated all safety inspection tasks.
Comment c, reproduced above, is directly applicable to the instant question and supports our conclusion that liability should not be imposed merely because Baptist reserved the right to inspect the work, established time schedules, or used its tax exemption status to purchase materials. A hospital/owner should not be exposed to liability merely based on its efforts to insure the safety of its patients. See Werdehausen v. Union Elec. Co., 801 S.W.2d 358, 361-366 (Mo.Ct.App.1990)( employee of an independent contractor, which had contracted with an electric company to build a nuclear power plant, sued the electric company after he was injured on the job; court held that defendant's mere retention of the power to forbid or stop the contractor's work if it was being done in an unsafe manner did not indicate a sufficient degree of retained control to expose the defendant to liability for injuries occurring to the contractor's employees).
Reviewing cases across the country considering this issue, the deciding question is who exercised control of the work, and thus was in the position to prevent the harm which occurred. Furthermore, there is no error in disposing of the issue by summary judgment. See Duplantis v. Shell Offshore, Inc., 948 F.2d 187, 193 (5th. Cir.1991)(summary judgment affirmed in case where, while working on a rig situated atop an offshore platform, a drilling company's employee slipped on a grease-covered board and fell onto the cover of a pedestal crane; the fact that the principal took an active interest in the safety of the employees of the independent contractor did not itself constitute the direct operational control to subject principal to liability even though it did keep a company man aboard the rig who initiated safety meetings and discussions with drilling company personnel and who may have had a hand in removing a drilling company crane operator from the job); Hines v. British Steel Corp., 907 F.2d 726, 729-32 (7th Cir.1990)(summary judgment affirmed where a corporation time-chartered a vessel from its owner, and hired a stevedoring company as an independent contractor to unload a cargo of steel, and an employee of the independent contractor was killed when a load of cargo was improperly swung over an open hatch and inexplicably fell into the hold below; court held that no contractual language indicated that the corporation undertook to control the manner in which the independent contractor's employees did their work, supervised, or ensured safety, nor did the corporation, in having its representative make advisory suggestions consistently determinative to the captain in charge of the stevedores, exercise the degree and type of control over those operations necessary to impose a duty of care on the corporation); Boutwell v. Chevron U.S.A., Inc., 864 F.2d 406, 408 (5th Cir.1989)(summary judgment affirmed, court holding that the presence of, and inspection by, owner's engineer was insufficient to establish *523 owner's control during repair of an oil platform; court considered the term "independent contractor" in the contract, and reasoned that the engineer's requests, communicated through the contractor's foreman, did not demonstrate operational control of the repair); Grammer v. Patterson Serv., Inc., 860 F.2d 639, 644 (5th Cir.1988)(holding evidence of operational control over the testing procedure was insufficient to create jury question where principal's instructions to the independent contractor were to maximize torque and remove weepholes); Hoffnagle v. McDonald's Corp., 522 N.W.2d 808, 813-15 (Iowa 1994)(summary judgment affirmed, court holding that under employer-independent contractor analogy, franchisor of fast food restaurant did not retain sufficient control over operations of restaurant to impose on it a duty of security owed to franchisee's employee, where franchisor's authority was no more than authority to insure uniformity in standardization of products and services offered by restaurant, and franchisee had power to control details of restaurant's day-to-day operation); Ashby v. Northwestern Public Service Co., 490 N.W.2d 286, 288-89 (S.D.1992)(summary judgment affirmed, where employee of independent contractor hired by utility to perform tree-trimming services was injured when his partner cut a power line, which fell and burned him, and employee sued utility; supreme court held that defendant owed plaintiff no duty of care because the contract between plaintiff's employer and defendant delegated all control and responsibility for safety to plaintiff's employer and defendant had retained only general supervisory control to ensure work's completion); Schoenbeck v. Du Page Water Comm'n, 240 Ill.App.3d 1045, 180 Ill.Dec. 624, 628, 607 N.E.2d 693, 697 (1993)(summary judgment affirmed where wife of a construction worker who was killed in an explosion during the construction of a municipal water system facility sued the county water commission; court held that the evidence did not demonstrate the level of control that warranted imposition of a duty on defendant, since its involvement in the construction of the municipality's facility existed only to ensure compatibility with its own system and to verify costs, not to oversee or direct the actual construction or the safety of the work site).
Thus, the linchpin to a determination of an owner's liability for physical harm to others under the facts alleged is control of the methods of work and operative details. An owner could perform a number of activities and still not expose himself to liability, if the activities were not directed at manner and method of work. Therefore, we conclude that the summary judgment issued in the hospital's favor was entirely correct.
Accordingly, the order under review is affirmed.
NOTES
[1] Although the term construction manager was used at times to describe Centex-Rogers, the testimony was unrefuted that Centex-Rogers was the project's general contractor. Centex-Rodgers hired Altman-Barry as a subcontractor for the job site in question to have responsibility for all safety requirements, such as OSHA requirements and installation of safety rails. The testimony established that Altman-Barry usually acted as a general contractor on a job site, and is well known for this type of work. Because Altman-Barry was functioning in the capacity of a subcontractor to Centex-Rogers, the contracting parties were looking for terminology to differentiate the two entities so that there would be no confusion if there was a generic reference to the general contractor.