GROSS, J.
In this personal injury action, the plaintiff below, Mariusz Gitenis, was injured *792 after he separated a two-part extension ladder owned by his employer. Using the part of the ladder that did not have traction feet, he gained access to a roof. On the way down the ladder, Gitenis fell after the ladder, which was neither secured to the building nor being held by another person, slipped. Although the plaintiff brought suit against the owner of a condominium conversion project, the general contractor, the independent contractor that hired him, and the property manager, this ease concerns just the judgment he obtained against the property manager, Sterling Financial & Management, Inc. The plaintiff recovered from Sterling, the only defendant participating in the trial below, on the theory that the company directed and controlled the manner in which the plaintiff performed his work. We reverse for the entry of a directed verdict in favor of Sterling because the evidence at trial demonstrated that Sterling did not participate in the details of the work to the extent necessary to make it liable to an employee of an independent contractor for the negligence of the contractor.
RAK Delray Limited Partnership, based in New York, owned Verano in Delray Beach, a project under construction renovations to convert its apartments into condominiums. To effectuate the project, the owner entered into a construction contract with Moss Development Co. to perform and supervise the project. Moss Development then hired INCOG, Inc. to be the construction supervisor and to hire the subcontractors. The plaintiff worked as an independent contractor of European Interiors & Exteriors, Inc., which was a subcontractor hired by INCOG to work on the interiors of units. European received its instructions on the Verano job from Moss Development or INCOG; both dealt with Piotr Zawadski, an owner of European, who communicated with the plaintiff in Polish because the plaintiff did not speak English.
Through the condominium association that it controlled, the owner entered into a garden variety condominium management agreement with Sterling “to manage and operate the Community’ on the owner’s behalf pursuant to all applicable “laws, regulations and requirements” and the association’s articles of incorporations, bylaws, and declaration of condominium. Article 2.05 of the agreement generally required Sterling to maintain the property, stating as follows:
Subject to the direction and at the expense of the Association, and in accordance with the Budget, [Sterling] shall during the term of this Agreement cause the Association Property to be maintained according to appropriate standards of maintenance consistent with the character of the Community, the Florida Statutes and the Association Documents and will make or install, cause to be made and installed, or do or cause to be done at Association’s expense all necessary or desirable repairs, interior and exterior cleaning, painting and decorating, plumbing, alteration, replacement, improvement and other normal maintenance and repair work on and to the Property in accordance with the standards and conditions reasonably specified by Association from time to time. Agent will not make unbudgeted expenditures for such purposes without the prior approval of Association, unless emergency repairs are necessary for the preservation of the Property or for the safety of the occupants, or are required to avoid the suspension of any necessaxy service to the property.
On behalf of the owner, Sterling inspected the renovation work for proper completion. Nothing in the contract obligated Sterling to supervise the work of Moss *793 Development, or any subcontractor, or to take responsibility for the safety of workers on the project. Rather, the contract authorized Sterling to act on behalf of the association to “expend any amount or incur contractual obligation in any amount reasonably required to deal with emergency conditions which may involve a danger of life or property or may threaten the safety of the Community or the owners or occupants.”
On October 24, 2005, Hurricane Wilma hit South Florida, resulting in substantial damage to the Verano project’s landscaping and roofing systems. For the cleanup, Moss Development, INCOG, and the subcontractors worked on an oral contract with the owner to clean up the property on a time and materials basis plus 10%. A Sterling employee instructed Moss Development to have European’s people assess the damage to the roofs and take photos; Moss Development and INCOG told Za-wadski to have European’s people stop working in the apartments to deal with roof problems. Zawadski had supervised roofing work since 1995 and he and the plaintiff had the necessary experience to work on the roofs. Zawadski then instructed the plaintiff and the other workers to clear debris from the roads and remove the mess from the roofs.
On the day of the accident, the plaintiff removed European’s extension ladder from his truck. The plaintiff and another worker determined they needed only eight feet of ladder to access the roof, so they divided the extension ladder into two parts; the plaintiff testified that his boss, Zawadski, ordered him to take the extension ladder apart and that he would have been fired if he refused. Each half of the ladder was used to access the roof. A third worker warned the plaintiff not to put the part of the ladder without rubber feet on cement, so it was placed on asphalt. Just before the accident, as the plaintiff was preparing to descend from a roof, someone yelled for him to wait because no one was holding the ladder. The plaintiff ignored the warning and the ladder slipped, causing the plaintiff to fall to the ground.
No one from Sterling spoke Polish, so no one from Sterling communicated directly with the plaintiff. Likewise, no one from Sterling told the plaintiff or European how to gain access to the roofs. Rather, Sterling’s role, as the property manager, was to assist, facilitate, and coordinate the work done on the property, which it did by identifying the types of jobs to be completed for the post-hurricane clean-up without telling the contractors how to do them or hiring its own subcontractors. Thus, as with any construction project, it was the obligation of the general contractor, not Sterling, to hire subcontractors, oversee the work performed by subcontractors, and maintain the safety of the project.
To pin legal responsibility for the accident on Sterling, the plaintiff relied on skillfully and carefully phrased general questions about Sterling’s responsibility for safety at Verano. For example, one Sterling witness, (1) agreed that “if there was something hazardous or amiss on the property,” it was her “responsibility to report” it; (2) agreed that one duty of a property manager was “to make sure that everything on the property was safe”; (3) agreed at her pretrial deposition that a property manager should “make sure that whoever is working on the property is doing so in a safe manner;” (4) indicated that if she saw something on a job that was unsafe, she would have spoken to Moss Construction or the particular contractor in charge; and (5) answered “Yes” at her deposition to the question of whether it would “be fair to say that ... the licensed property manager for Verano at the time of this accident, would be involved *794 in supervising the means, methods, and procedures for the contractors on the job site.”
The general rule is that “ ‘one who hires an independent contractor is not liable for injuries sustained by that contractor’s employees in performing their work.’ ” Morales v. Weil, 44 So.3d 178, 176 (Fla. 4th DCA 2010) (quoting Johnson v. Boca Raton Cmty. Hosp., Inc., 985 So.2d 593, 595 (Fla. 4th DCA 2008)); see Restatement (Second) of Torts § 414 (1965).[1] An exception to this general rule of non-liability, which the plaintiff seeks to apply in this case, occurs where the employer of an independent contractor actively participates in or interferes with the job “ ‘to the extent that he directly influences the manner in which the work is performed.’ ” Morales, 44 So.3d at 176 (quoting Johnson, 985 So.2d at 595-96).
The rationale for the general rule is that since the employer of an independent contractor “has no power of control over the manner in which the work is to be done by the contractor, it is to be regarded as the contractor’s own enterprise,” and it is the contractor that is the “proper party to be charged with the responsibility of preventing the risk, and bearing and distributing it.” Restatement (Second) of Torts § 409, cmt. b (1965); see Armenteros v. Baptist Hosp. of Miami, Inc., 714 So.2d 518, 522 (Fla. 3d DCA 1998) (recognizing that the person “who exercised control of the work” was in the best “position to prevent the harm that occurred”). The purpose of the exception is not to spread a cost among many actors, but to allocate risk to the entity best situated to prevent the loss. A meddlesome employer “forfeits his immunity from liability under the general rule by so insinuating himself into his independent contractor’s performance of the contract that the performance becomes his own.” Indian River Foods, Inc. v. Braswell, 660 So.2d 1093, 1097 (Fla. 4th DCA 1995).
To prove the requisite control over an independent contractor in the absence of a written contract, the plaintiff must show that the employer “ ‘actually exercised control over the manner in which the independent contractor’s work was performed.’ ” Arsement v. Spinnaker Exploration Co., 400 F.3d 238, 252 (5th Cir. 2005) (quoting Dow Chem. Co. v. Bright, 89 S.W.3d 602, 606 (Tex.2002)). Merely exercising “ ‘a general right to recommend a safe manner for the independent contractor’s employees to perform their work’ is insufficient to subject a party to liability.” Id. (quoting Dow Chem. Co., 89 S.W.3d at 606). To impose liability in a case like this one, a plaintiff must establish actual facts demonstrating the exercise of control before the accident causing injury.
The amount of control needed to pierce the general rule’s “shield of liability must be extensive.” Morales, 44 So.3d at 176. Comment c to Section 414 of the Restatement (Second) of Torts establishes the parameters of the “retention of control” concept, stating:
*795 It is not enough that [the employer of an independent contractor] has merely a general right to order the work stopped or resumed, to inspect the progress or to receive reports, to make suggestions or recommendations which need not necessarily be followed, or to prescribe alterations and deviations. Such a general right is usually reserved to employers, but it does not mean that the contractor is controlled as to his methods of work, or as to operative detail. There must be such a retention of right of supervision that the contractor is not entirely free to do the work in his oum way.
(Emphasis added); see also Van Ness v. Indep. Constr. Co., 392 So.2d 1017, 1019 (Fla. 5th DCA 1981) (citing comment c for the same proposition). The key inquiry is whether the independent contractor is controlled “ ‘as to his methods of work, or as to operative detail.’ ” Morales, 44 So.3d at 176 (quoting Cecile Resort, Ltd. v. Hokanson, 729 So.2d 446, 448 (Fla. 5th DCA 1999)). As the third district has explained,
an owner has a right to inspect the work of an independent contractor to determine that the work conforms to the contract and to reject unsatisfactory work and demand that it be made satisfactory. Moreover, this reservation is not a usurpation of control and does not change an owner from a passive non-participant to an active participant in the construction. To impose liability on the owner for retention of control over an independent contractor, there must be such right of supervision or direction that the contractor is not entirely free to do the work his own way.
City of Miami v. Perez, 509 So.2d 343, 346 (Fla. 3d DCA 1987) (citations omitted); see also Van Ness, 392 So.2d at 1019.
This case is similar to those cases that have found an inadequate retention of control to impose liability on the employer of an independent contractor for the contractor’s negligence. In Cecile Resort, Ltd., the defendant hired an independent contractor to paint the defendant’s flag pole. 729 So.2d at 447. While the plaintiff/independent contractor “climbed up the pole using a steel cable attached to the pole,” the cable broke, causing the plaintiff to fall to the ground. Id. On appeal, the third district reversed the plaintiffs verdict, holding in part that there was no evidence that the defendant “exercised control” over the plaintiffs work, even though the defendant “insisted that the work be completed the next day” and the plaintiff was injured climbing the defendant’s flag pole. Id. at 448.
Similarly, in St. Lucie Harvesting & Caretaking Corp. v. Cervantes, 639 So.2d 37, 38 (Fla. 4th DCA 1994), the defendants were orange grove owners, and the plaintiff was a fruit picker employed by an independent contractor “to remove the fruit from the trees and get it to the edge of the orange grove.” To perform this job, the independent contractor used a special dump truck called a “goat,” which was designed to be used in citrus groves but not on highways. Id. The plaintiff was injured while driving a goat on the highway from one grove to another after “he turned a corner too fast and caused the goat to roll over.” Id. We reversed the plaintiffs verdict after a jury trial, holding that there was no evidence that the grove owner actively participated in the work of the independent contractor to the extent that he directly influenced the manner in which the work was performed. Id. at 39-40. In so ruling, we observed that the
plaintiff was not injured because of any condition of the defendants’ premises or equipment. Nor were defendants exercising any control over the manner in which this crew was performing its work. Defendants’ foreman told the in *796 dependent contractor’s foreman when the crew had picked enough fruit at one grove, and where the crew should begin picking thereafter, but exercised no control over how the crew got to the next grove, what equipment was used, what route the crew took, how fast the crew went, or who drove the goat. The goat, which was allegedly dangerous, was owned by the independent contractor, not the defendants. The plaintiff, who was not experienced in driving the goat on the highway, was told to drive the goat by the foreman of the independent contractor, not the defendants.
Id. at 40.
Finally, in Strickland v. Timco Aviation Services, Inc., 66 So.3d 1002, 1005 (Fla. 1st DCA 2011), the owner of an airplane hangar hired an independent contractor to pressure wash the roof of the hangar and to perform repair and maintenance on the roof skylights. The plaintiff, an employee of the independent contractor, fell through a skylight while pressure washing the roof. Id. The plaintiff sued the owner and the trial court granted summary judgment in favor of the owner. Id. at 1006. In affirming, the first district held that there was no evidence that the owner had actively controlled the manner in which the independent contractor performed the work, even though it had provided the contractor with a safety harness and a man lift to do the job. Id. The court observed that “mere inspection by a property owner of an independent contractor’s work does not amount to control of the work or active participation by the property owner.” Id. The court noted that the owner’s providing the contractor with a safety harness did not amount to participation in or direct control over the work performed by the independent contractor and its employees. Id. at 1006-07; see also Morales, 44 So.3d at 178 (where court observed that owners “did not tell the workers how to get on the roof, where to stand on the roof, what tools to use, or what safety equipment to either use or not use”); Indian River Foods, 660 So.2d at 1097-98; Armenteros, 714 So.2d at 522-23.
By contrast, in those cases imposing liability, the independent contractor’s employer occupied more than a mere supervisory role, typically by assuming extensive control over safety procedures or actively participating in the operation itself. In Cadillac Fairview, for example, the plaintiff, the employee of an independent contractor, suffered severe injuries at a construction site after falling through an opening that was unprotected by safety guard rails. 468 So.2d at 419. Following a trial, the jury awarded the plaintiff $750,000 after finding the defendant, who was the project’s owner and general contractor, 85% negligent for the injury. Id. at 420. In affirming the jury award, the third district found the defendant exercised sufficient control over supervision to warrant liability, since it “had a staff of field supervisors who oversaw, directed and coordinated the construction project”; “[t]he superin-tendant made daily progress reports to [the defendant] and sometimes became physically involved in the construction”; and the defendant had “obtained the necessary permits for the construction.” Id. at 421. From such measures, the court found the defendant, through its active participation in effectuating the project’s safety procedures, to have taken steps beyond its right of general inspection, thus availing itself of its immunity by accepting the “duty to keep its premises safe for all the workmen on the job.” Id.; see also, e.g., Aguirre v. Turner Constr. Co., 501 F.3d 825, 827, 830-31 (7th Cir.2007) (finding requisite participation to impose liability where the general contractor “promulgated an *797 extensive 125-page safety program that all subcontractors were required to follow”; hired personnel to oversee development; “held monthly safety meetings”; had “personnel walk[] the work site daily to monitor compliance with these safety requirements”; and created a safety program, which included 23 rules pertaining to the erection of the scaffolding where the plaintiff was injured); Stephens v. Crown Equip. Corp., 22 F.3d 832, 835 (8th Cir.1994) (finding a warehouse owner to have availed itself of its immunity since the owner (1) provided the independent contractor’s employees with “pick cards,” detailing “all of the information needed for [the] employees to complete their daily assignments,” and (2) “owned and assumed maintenance responsibilities of all of the equipment in the warehouse”).
More analogous to the case at hand, in Sanna v. National Sponge Co., 209 NJ.Super. 60, 506 A.2d 1258, 1259 (1986), the defendant hired an independent contractor, JSC, to insulate its factory. As part of this duty, a JSC representative instructed the plaintiff, a JSC employee, to fix the factory’s faulty sprinkler system. Id-. To reach the ceiling, the plaintiff and a co-worker arranged makeshift scaffolding using a dismantled ladder, supplied by JSC, and a forklift and planks, supplied by the defendant. Id. Before the plaintiff finished the job, however, one of the defendant’s employees borrowed the forklift to use it at another location; the absence of the forklift, along with grease found on the ladder, rendered the scaffolding “shaky,” eventually causing it to collapse and injure the plaintiff. Id. On appeal, the New Jersey Superior Court found the defendant to have exhibited sufficient “control over and participation at the plaintiffs workplace” to warrant liability by:
first providing and then removing the forklift from the jerry-rigged scaffolding, not providing conventional scaffolding in the first place once it voluntarily had participated in the undertaking to help furnish scaffolding materials, and its general maintenance of the work area in the aspect of cleanliness.
Id. at 1261. In reaching this conclusion, the court noted that “[i]f the defendant had done nothing and plaintiffs employer JSC had assumed sole control over the ladders and scaffolding used to gain access to the work area, plaintiff would have no case against defendant on this theory.” Id. at 1262. However, once the defendant “undertook to supply parts of the scaffolding, especially in view of the past relations of defendant and JSC where defendant frequently provided equipment to its contractor, ... a jury could find that defendant exercised the requisite control over the jobsite to create a liability exposure.” Id. at 1263; see also, e.g., Titan Steel Corp. v. Walton, 365 F.2d 542, 546-47 (10th Cir. 1966) (finding a general contractor liable on the theory of “active participation” where the independent contractor requested the use of the defendant’s crane; the defendant’s superintendent discussed and approved the crane’s specific usage; and the defendant’s chief engineer made “daily inspections” of the project’s progression); Hirschbach v. Cincinnati Gas & Elec. Co., 6 Ohio St.3d 206, 452 N.E.2d 326, 329 (1983) (finding active participation where the defendant’s inspector specifically denied the request of the independent contractor’s employees to re-position a winch tractor, resulting in the plaintiffs injury).
In this case, there is even less of a basis than existed in Cecile Resort, Cervantes, Strickland, and Morales to find Sterling to have exercised control over the way European’s hiree, the plaintiff, accessed the roof. European owned the offending ladder. European told the plaintiff to split it apart to use it to get on the roof. The *798 plaintiff and a coworker separated the ladder. None of the Sterling representatives on site ever communicated with the plaintiff, who spoke only Polish. None of the Sterling representatives told European workers “how to get on the roof, where to stand on the roof, what tools to use, or what safety equipment to either use or not use” to perform the jobs that they were assigned by European. Morales, 44 So.3d at 178. Sterling representatives did no more than identify the work that the independent contractor was to complete.
Imposing liability upon Sterling would do violence to the rationale behind the exception to the general rule that one who hires an independent contractor is not liable for injuries sustained by that contractor’s employees in performing their work; European was in total control of the ladder and how it was used, so it therefore had the “responsibility of preventing the risk, and bearing and distributing it.” Restatement (Second) of Torts § 409, Comment b (1965). The absence of actual facts showing how Sterling exercised control over the job cannot be overcome by vague, after-the-fact questions about general policy which make reference to legal code words. Careful vocabulary selection during litigation cannot overcome the absence of meddlesome conduct prior to the occurrence of an accident by one who employs an independent contractor. To place liability on Sterling in this case would open the door to liability for every Florida property owner hiring an independent contractor who negligently uses his own tools.
The final judgment is reversed and remanded to the circuit court for entry of a directed verdict in favor of the defendants.
LEVINE, J., and SHAHOOD, GEORGE A., Senior Judge, concur.
NOTE: Levine, J., did not participate in oral argument, but has had the opportunity to review the entire case, briefs, and oral argument proceedings.

. Section 414 of the Restatement (Second) of Torts states:
One who entrusts work to an independent contractor, but who retains the control over any part of the work, is subject to liability for physical harm to others for whose safety the employer owes a duty to exercise reasonable care, which is caused by his failure to exercise his control with reasonable care. Comment a of section 414 emphasizes that it is when the employer of an independent contractor "retains control over the operative detail of doing any part of the work" that "he is subject to liability for the negligence of the employees” of the independent contractor.